# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Darrell L. Smeltzer,
George R. Gutierrez, and
Jon D. Watts,

|  |  |
|---|---|
| Plaintiffs, | Civ. No. 03-2847 (RHK/JJG) |
|  | **MEMORANDUM OPINION** |
|  | **AND ORDER** |
| v. |  |
| Medtox Laboratories and |  |
| Burlington Northern and Santa Fe |  |
| Railway Company, |  |
| Defendants. |  |

Mark W. Bay, Peterson, Engberg & Peterson, Minneapolis, MN, for Plaintiffs.

D. Faye Caldwell, Ernest L. Everson, Caldwell & Clinton P.L.L.C., Houston, TX, and William F. Davern, Tamara L. Novotny, and Michael D. Barrett, Cousineau, McGuire & Anderson Chartered, Minneapolis, MN for Defendant Medtox Laboratories.

Rodney A. Honkanen and Scott H. Rauser, Spence, Ricke, Sweeney & Gernes, P.A., St. Paul, MN, for Defendant Burlington Northern and Santa Fe Railway Company.

## Introduction

Plaintiffs were employees of Defendant Burlington Northern and Santa Fe Railroad

Company ("BNSF") when they were required to submit to drug tests. The test results

showed the presence of adulterants in Plaintiffs' urine samples, which led to their

dismissals.  Plaintiffs brought this negligence action against BNSF and Medtox

Laboratories, Inc., the company which conducted the testing, alleging that their urine

samples were disposed of prematurely and, alternatively, that improper procedures were

used when collecting their samples.  Defendants now move for summary judgment.  For the

reasons set forth below, the Court will grant Defendants' Motions.

**Background**

**A.      The Parties**

Plaintiffs Darrel Smeltzer and Jon Watts are former employees of BNSF and

Plaintiff George Gutierrez is a current employee of BNSF (collectively "Plaintiffs").

Plaintiffs are California residents, and BNSF is a Delaware corporation with its principal

place of business in Texas.  Defendant Medtox Laboratories, Inc. ("Medtox"), a Delaware

corporation with its principal place of business in Minnesota, is a laboratory with which

BNSF contracted to perform federally mandated drug tests on employees; it is certified by

the Substance Abuse and Mental Health Services Administration ("SAMHSA") to perform

federal workplace drug testing.  (Reply Collins Aff. ¶ 6.)  Only SAMHSA-certified

laboratories are permitted to test federally regulated urine samples, such as those at issue

here.  (Id.)

In 1999 and 2000, while they were employees of BNSF, Plaintiffs were

independently given drug tests pursuant to federal regulations.  The results of each drug test

showed the presence of "adulterants" in the tested urine.  BNSF deems an "adulterated"

2

sample—that is, a sample that has been tampered with by adulteration—a "refusal to provide a urine specimen," which subjects the employee to dismissal.  (Ringstad Aff. Ex. A.)

Upon receipt of their drug test results, each Plaintiff requested a retest of his "split sample."[1]  BNSF conferred with the Department of Transportation ("DOT"), and was informed that, pursuant to federal regulations in effect at the time, adulterated samples were not to be retested.  Pursuant to this direction, BNSF did not allow retests of Plaintiffs' split samples.

Following BNSF's refusal to retest, Plaintiffs' attorney at the time, Lawrence Mann, sent letters to Medtox and BNSF, requesting that each split sample be saved for retesting.[2]  (See Mann Dep. Tr. at 50-55.)  Neither Medtox nor BNSF recalls receiving those letters.  Medtox disposed of each split sample more than a year after each was collected, in its regular course of business.

A brief description of the facts surrounding each Plaintiff's drug test follows.

**1.      Gutierrez**

---

[1]BNSF uses the "split sample" method of urine collection, which involves the urine sample being split into two containers at the time of collection, and each container then being sealed in the employee's presence.  (See Ringstad Aff. Ex. A ¶ 11.1.)  In some instances that split sample would then be available for any retesting that might be needed.

[2]The letters were dated June 10, 1999, August 9, 1999, and June 1, 2000, regarding Smeltzer, Gutierrez, and Watts respectively.  (Bay Aff. Ex. J; Compl. ¶¶ 34, 35.)

On January 24, 1999, Gutierrez was working as a brakeman for BNSF when his crew made a mistake that almost caused an accident.  (Gutierrez Dep. Tr. at 51-52.)  As a result, Gutierrez and his crew were required to submit to "for cause" drug tests.  (Id. at 59.) Gutierrez gave a urine sample to a collector who split the sample into two containers and sealed them in his presence.  (Id. at 104.)  Gutierrez testified that he did not wash his hands prior to giving his urine sample and, during the course of his job, he routinely came into contact with various chemicals.  (Id. at 96.)  He also testified that the collector of his sample appeared ill and was sniffling, coughing, and sneezing at the time she took his sample.  (Id. at 99.)

Gutierrez's sample was sent to Medtox for analysis and tested positive for nitrite, an adulterant for which Medtox screens.  Medtox determined that the sample had a nitrite level of 1725 µg/ml, more than three times the maximum concentration considered to be a normal physiological concentration by the Federal Railway Administration ("FRA"). (Crespin Aff ¶ 4, Ex B.)  Based on the test results, BNSF concluded that the sample had been adulterated.

On May 28, 1999, after a formal investigation pursuant to the governing  Collective Bargaining Agreement ("CBA"), Gutierrez was dismissed.  (Ringstad Aff. Ex. C.)  Gutierrez then filed a grievance with his union and, because of a mailing error that caused time-limit violations under the CBA, Gutierrez was reinstated with full back pay.  (Id. Ex. D.)

### 2.      Smeltzer

On January 30, 1999, Smeltzer, a BNSF conductor, was given a random drug test when he reported to work. (Smeltzer Dep. Tr. at 30).  His sample was split into two containers and each was sealed in his presence.  (Id. at 44.)  The collector of Smeltzer's sample stored the sample in her car for "a couple of hours," and then put it into a Fed-Ex package which arrived at Medtox for testing three days later.  (Bay Aff. Exs. A, B.)

On February 10, 1999, BNSF informed Smeltzer that his sample indicated adulteration because it had a nitrite level of 4108 µg/ml, over eight times the maximum considered to be a normal physiological concentration.  (Crespin Aff. Ex. D.)  On February 12, 1999, Smeltzer saw his physician, who diagnosed Smeltzer as having a urinary tract infection and a nitrate level of "4+."  (Bay Aff. Ex. E.)  On March 22, 1999, following a formal investigation pursuant to the CBA, Smeltzer was discharged for violating BNSF's drug and alcohol policy.  (Ringstad Aff. Ex. E.)

### 3.      Watts

On April 4, 2000, Watts, a BNSF trainman, was required to submit to a drug test "for cause." (Crespin Aff. Ex. O.)  The test yielded a positive result for chromium, which Medtox considers to be evidence of adulteration.  (Id.)  At a formal investigation conducted pursuant to the CBA, Watts admitted to using "Purafyzit," an adulterant containing

chromium.  (Ringstad Aff. Exs. G, H; and Caplin Aff. ¶ 10.)  Watts was subsequently

dismissed for violation of its drug and alcohol policy.[3]  (Ringstad Aff. Exs. I, J.)

**B.      The DOT Litigation**

In September 1999, Mann filed suit in the United States District Court for the

Central District of California (the "California Court") on behalf of Gutierrez, Smeltzer, and

another plaintiff who is not a party to the instant action (the "California plaintiffs"), against

the DOT and others, challenging the federal regulation that did not allow retests of

adulterated samples.[4]  (Honkanen Aff. Ex. D, No. Civ. 99-09490.)  The California Court

dismissed the action, and the California plaintiffs appealed to the Ninth Circuit Court of

Appeals.[5]  During the pendency of the appeal, the relevant regulation was revised to allow

for retesting of adulterated samples, and the Ninth Circuit directed the parties to "provide

supplemental letter briefs addressing the effect, if any, of such revision on the issues

presented in this appeal."  (Ninth Circuit Court of Appeals Docket 00-55518, 8/22/01

---

[3]Watts has not answered discovery in this action, has not responded to the instant Motions, and is no longer represented by legal counsel.  (Doc. No. 20.)

[4] Specifically, the California plaintiffs claimed that 49 C.F.R. § 219.709(b), as it applied to their alleged adulterated samples, denied them "due process of law protected by the United States Constitution."  (California Court Order Dismissing Complaint at 2.)  That regulation authorized "a retest of any sample determined to be positive . . . [h]owever, no such procedure [was] provided if the sample [was] considered by the testing laboratory to be adulterated, and DOT issued a memorandum stating that a re-test of the alleged adulterated sample [was] not allowed."  (Id. at 3.)

[5]Mann brought a similar action on behalf of Watts and another plaintiff, which was stayed pending the appeal of the Smeltzer action.  (Mann Dep. 21).

entry.)  The parties thereafter reached a settlement and the DOT agreed to pay for retests of the California plaintiffs' split samples.  However, as discussed above, by the time the settlement was reached, Medtox had disposed of the instant Plaintiffs' split samples.

## C.      The Instant Litigation

On April 11, 2003, Plaintiffs brought the instant action alleging that Defendants were negligent in prematurely disposing of Plaintiffs' split-samples, which disposal precluded their use for retesting.  Plaintiffs claim that Defendants "should have known of the probable injurious consequences which could inure to Plaintiff[s] if the evidence in their custody was . . . disposed of prior to Plaintiff[s] being afforded an opportunity to conduct independent toxicological testing upon [the] sample."  (Compl. ¶¶ 20, 30, 38.) Plaintiffs also claim that Defendants should have known that "such evidence would be critical to any civil or administrative action brought by Plaintiff[s] to challenge the conclusion that [they] had adulterated th[e] sample[s]."  (Id.)  In particular, Plaintiffs claim negligence in Defendants' "failing to properly maintain, preserve, and care for" the samples; "losing, disposing of, and/or destroying" the samples; and"failing to institute safe and proper procedures and practices to ensure" samples under their control were "properly preserved and maintained."  (Id. ¶¶ 21, 31, 39).  Plaintiffs assert that Defendants' alleged negligence caused them the loss of a "meaningful opportunity" to challenge the results of the test, which resulted in loss of wages, loss of future opportunities, as well as extreme

embarrassment, anxiety, and ridicule.  (Id. ¶ 40.)  Defendants now move for summary

judgment.

## Standard of Decision

Summary judgment is proper if, drawing all reasonable inferences favorable to the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

The moving party bears the burden of showing that the material facts in the case are

undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety

Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the

nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th

Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The

nonmoving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

## Analysis

Plaintiffs[6] seek to hold Medtox directly liable for negligence associated with the processing of their drug tests, and BNSF vicariously liable for that negligence because BNSF "selected the collector of both Plaintiffs' urine samples and required both Plaintiffs to submit to the collection of their urine in order to remain BNSF employees." (Mem. in Opp'n at 4.) Both Medtox and BNSF argue that Plaintiffs' negligence claims fail on their merits for various reasons, including lack of evidence of causation. BNSF also advances the independent defenses that it cannot be held vicariously liable for the acts of independent contractors, (BNSF Mem. in Supp. at 8-10), and that the claims against it are preempted under the Railway Labor Act (id. at 10-12), the Federal Omnibus Transportation Employees Testing Act ("FOTETA"), the Federal Railroad and Safety Act ("FRSA"), and the FRA regulations (id. at 18-21).[7] The Court will first consider the primary negligence claims against Medtox and then consider the claims against BNSF.

---

[6]Hereinafter, the Court will refer to Smeltzer and Gutierrez as "Plaintiffs." The Motions for Summary Judgment against Watts will be granted, as Watts has not responded to discovery in this action, has not opposed the instant Motions and, in the Court's view, has abandoned his claims.

[7]Discovery in this case was stayed from February 23, 2004 (Doc. No. 29) to December 7, 2004 (Doc. No. 31), pending the Eighth Circuit's decision in Chapman v. Lab One, 390 F.3d 620 (8th Cir. 2004). In Chapman, the Eighth Circuit held that a railroad employee's state common-law tort claims against a laboratory that performed federally mandated drug testing were not preempted by the FOTETA. Id. at 629. The court found significant the existence of a "drug testing regulation promulgated by the Secretary [of Transportation] that specifically contemplates the existence of common-law negligence actions arising from the drug testing process." Id. at 627. However, the court also suggested that, although the provision applies to testing laboratories, it might not apply to employers because it "is directed to negligence on the part of others involved in the collection, handling, and analysis of specimens." Id. at 628. (See also infra.)

A.     **Negligence of Medtox**

Plaintiffs have advanced two different—and in some respects inconsistent—theories of negligence against Medtox.  The first is advanced in their Complaint; there, Plaintiffs allege that Medtox was negligent because it prematurely disposed of their split samples and "such evidence would be critical to any civil or administrative action brought by Plaintiff[s] to challenge the conclusion that [Plaintiffs] had adulterated th[e] sample[s]."  (Compl. ¶¶ 20, 30, 38.)  The Complaint alleges that Medtox's negligence consisted of actions and/or inactions that led to the destruction of the split samples.  (Id. ¶¶ 21, 31, 39.)  Plaintiffs largely ignore this theory of recovery in their response to the instant Motions.

Plaintiffs have, however, advanced a second theory (although not with adequate clarity) in response to the instant Motions—namely, that certain irregularities in the sample collection procedures establish "the negligent collection, handling and analysis of Plaintiffs' urine samples for drug testing purposes."  (Mem. in Opp'n at 4.)

Defendants assert that Plaintiffs have failed to establish that Medtox owed them a legal duty of care and, alternatively, that Plaintiffs have not established the appropriate standard of care.  (See Medtox Mem. in Supp. at 7-12; BNSF Mem. in Supp. at 13-15.)  They also argue that Plaintiffs have failed to provide sufficient evidence of causation.  (See Medtox Mem. in Supp. at 13-16; BNSF Mem. in Supp. at 15-17.)  The Court determines that the issue of causation is dispositive of the instant Motions.

The essential elements of a negligence claim are: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury was sustained; and (4) breach of the duty was the proximate cause of the injury.  Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn. 1995). A defendant in a negligence action is entitled to summary judgment when the record reflects a complete lack of proof on any of the four elements necessary for recovery. Louis v. Louis, 636 N.W.2d 314, 318 (Minn. 2001).

Causation must be established beyond the point of speculation.  DeCourcy v. Trustees of Westminster Presbyterian Church, Inc., 134 N.W.2d 326, 328 (Minn. 1965).  It is incumbent on the plaintiff to "introduce evidence which would afford a reasonable basis for the conclusion that it was more likely than not that the [alleged breach] was . . . the . . . cause of the [injury]."  Id. (citations omitted).  "A mere possibility of such causation is not enough."  Id. (citation omitted); see also Schweich v. Ziegler, Inc., 463 N.W.2d 722, 729 (Minn. 1990); Abbett v. County of St. Louis, 474 N.W.2d 431, 434 (Minn. App. 1991).

With respect to Plaintiffs' first theory—that Medtox's premature destruction of the split samples injured Plaintiffs—Defendants argue that Plaintiffs' failure to offer any admissible testimony or evidence—expert or otherwise—that a retest of the split sample would have or could have produced a result different from the original test is fatal to their claims.  (Medtox Mem. in Supp. at 13-16; BNSF Mem. in Supp. at 15-17.)

Plaintiffs' entire argument regarding this theory is:

for purposes of deciding this motion, Medtox received Mr. Mann's
instructions not to destroy Mr. Gutierrez's and Mr. Smeltzer's urine samples
and nonetheless destroyed them without affording the Plaintiffs any
opportunity for further testing.  Under these circumstances, the Court should
conclude that there is sufficient evidence for a jury to consider with respect
to all elements of a negligence cause of action.

(Mem. in Opp'n at 6.)  Plaintiffs do not specifically address the issue of causation, nor do

their supporting documents even arguably go to this issue.

The Court determines that Plaintiffs have failed to submit sufficient evidence of

causation regarding the theory of negligence pleaded in their Complaint.  Without any

evidence that Medtox's original test results were inaccurate, or that retesting the split

samples might yield different results, Plaintiffs cannot show that they were harmed by the

"premature" destruction of the split samples.  There is nothing in the record to suggest that

Medtox's testing procedures were flawed or inadequate, that Medtox's standards were not

proper, or that "further testing" would have been different in any way from the initial testing

by Medtox.  Accordingly, the Court concludes that Plaintiffs have failed to raise a genuine

issue of material fact with respect to the theory of negligence pleaded in their Complaint.

However, for the sake of completeness, the Court will consider Plaintiffs' second theory,

which they raised in response to the instant Motions.

With respect to the second theory—that the sample collection process suffered

from irregularities—Defendants argue that Plaintiffs' claims must fail for a complete lack

of evidence of causation and that the documents Plaintiffs have presented are not relevant

12

to the facts underlying this action.  According to Defendants, Plaintiffs have failed to present any evidence that the alleged irregularities in the collection procedure caused the increased nitrite levels in Plaintiffs' samples.  (BNSF Reply Mem. at 5.)

In addition, Defendants assert that under Plaintiffs' second theory, "Defendants cannot be negligent for failing to preserve the samples for retesting since the theor[y] assume[s] there were high levels of nitrites in the samples."  (Id. at 2.)  Thus, even if Plaintiffs had advanced some evidence to support the theory, it rests on the accuracy of the test results, which is at odds with the theory pleaded in the Complaint—namely that the test results were inaccurate.[8]  (Medtox Reply Mem. at 6; BNSF Reply Mem. at 1-2.)

Plaintiffs' entire argument in response is as follows:

> Medtox, by virtue of the items completed on its drug testing form, knew that the samples it was testing had been collected at least two days prior to initiation of its testing procedure.  Its own publication states that a sample can only be refrigerated for one day and must thereafter be frozen.  Here there is no evidence that the urine samples were refrigerated or frozen at any time prior to testing.  In addition, its own publication recognizes that excessive levels of nitrite may result from urinary tract infections or bacterial contamination and improper storage.

(Mem. in Opp'n at 5-6.)

Plaintiffs contend that they have submitted an "article from a medical journal regarding the process by which bacterial enzymes convert nitrates in urine to nitrite."  (Bay

---

[8]Defendants also argue that the claim of irregularities in the collection of the samples is not an appropriate claim here because it was not pleaded in the Complaint, and neither BNSF nor Medtox employed the collectors of the samples.

Aff. ¶ 8, Ex. F.)  In fact, the "article" appears to be two excerpts from possibly different publications, each excerpt less than a page in length, submitted by Smeltzer to "BNSF Manager Kirschinger" in early 2000.  (Id.)  Neither excerpt contains information regarding what publication it is taken from, nor have Plaintiffs submitted the excerpts with any context for the general discussion of nitrite in urine.

Plaintiffs have also submitted "a publication regarding [Medtox's] drug testing devices and procedure."  (Bay Aff. ¶ 11, Ex. I ("Exhibit I").)  Exhibit I states that "Urine may be tested immediately following collection.  If it is necessary to store the urine, store under refrigeration for no more than one day.  Urine may be frozen for longer storage." (Id. Ex. I at 9.)  It also states that "[n]itrite levels due to urinary tract infections or bacterial contamination and improper storage, might not exceed 36 µg/ml."  (Id. Ex. I at 14.)

Medtox disputes the relevance and admissibility of Exhibit I.  Medtox's Laboratory Director, Jennifer Collins, Ph.D., avers that Exhibit I was issued by Medtox Diagnostics, Inc., a separate corporation from Defendant Medtox Laboratories, Inc.[9]  (Reply Collins Aff. ¶¶ 3-4.)  The product described in Exhibit I "is a non-instrumented screening test for use by collectors performing 'on-site' screening for drugs of abuse" and the use of such a product is prohibited "for federally regulated urine specimens such as plaintiffs' specimens."  (Id.

_____

[9]The two corporations are subsidiaries of Medtox Scientific, Inc.  (Reply Collins Aff. ¶ 4.) Medtox Diagnostics, Inc., is not certified by the SAMHSA to perform federal workplace drug testing, whereas Defendant Medtox Laboratories, Inc. is.  (Id. ¶¶ 5, 6.)  As discussed above, only SAMHSA-certified laboratories are permitted to test federally regulated samples, such as the samples at issue in this case.  (Id. ¶ 6.)

¶¶ 8, 9.)  Furthermore, the "methodology utilized [in the non-instrumented screening device described in Exhibit I] is based on different scientific principles than the laboratory-based SAMHSA confirmatory procedures relied upon to determine" the results at issue here.  (Id. ¶ 11.)  Finally, "the collection instructions described in Exhibit I are not the collection instructions provided to Medtox Laboratories, Inc. customers using laboratory based testing, such as plaintiffs' samples."  (Id. ¶ 10.)

The Court determines that the evidence submitted by Plaintiffs in opposition to the instant Motions falls far short of that needed to survive summary judgment.  While the Court is mindful that issues of causation often involve questions of fact, see Illinois Farmers Ins. Co. v. Tapemark Co., 273 N.W.2d 630, 633-34 (Minn. 1974); Moe v. Springfield Milling Corp., 394 N.W.2d 582, 585 (Minn. Ct. App. 1986), summary judgment is appropriate where the nonmoving party has failed to point to any evidence that would allow the jury to reasonably find for the nonmoving party, see DLH, Inc. v. Russ, 566 N.W.2d 60, 71 (Minn. 1997).  "Where the evidence is such that a trier of fact can do no more than guess or conjecture as to which of several acts was in fact the efficient cause, the plaintiff has failed to prove that the defendant's breach caused the injury."  Schweich, 463 N.W.2d at 729 (citations omitted).  Here, Plaintiffs have failed to point to any relevant or admissible evidence that would allow a trier of fact to reasonably conclude that

Medtox's negligence was the cause of Plaintiffs' test results.[10]  See Baker v. Abo, 2003 WL
21639151, at * 4 (D. Minn. July 2, 2003) (holding that the plaintiff did not establish
causation in negligent drug testing case where his only expert did not opine that the breach
at issue "could have caused the positive result in [the plaintiff's] test").   Accordingly,
Plaintiffs cannot prove an essential element of their negligence claims, and summary
judgment in favor of Medtox is appropriate.

**B.      Liability of BNSF**

       Plaintiffs' sole theory of liability against BNSF is that of vicarious liability.  They
argue that "unless this Court holds . . . BNSF responsible for the actions of the collector
and drug testing laboratory which it selects [BNSF] will have no incentive to take care in the
selection of its collectors and testing laboratories, and no incentive to require its
collectors and testing laboratories to investigate issues that arise in connection with the

---

[10]Defendants also argue that because Plaintiffs did not offer expert testimony to establish
either Medtox's duty of care or the issue of causation, their claims fail as a matter of law.
Expert testimony is required to establish causation in negligence cases where the "question
involves obscure and abstruse medical factors such that the ordinary layman cannot
reasonably possess well-founded knowledge of the matter and could only indulge in
speculation in making a finding." Gross v. Victoria Station Farms, Inc., 578 N.W.2d 757,
762 (Minn. 1998) (internal quotation omitted).  The Court has reservations as to whether
this is a case in which a breach of the standard of care or causation could be established
without expert testimony.  See, e.g., Cooper v. Laboratory Corp. of Am. Holdings, Inc., 150
F.3d 376, 380-81 (4th Cir. 1998) (in a case against a lab alleging negligence in reporting a
positive drug test result, the court found that the plaintiff had "utterly failed to establish that
[the lab] breached its professional standard of care" where the plaintiff's expert was not
qualified to testify regarding the accuracy of the drug test, and the plaintiff offered no other
evidence to support her case).  However, even assuming Plaintiffs could hypothetically
introduce non-expert evidence sufficient to prove causation, they have not done so here.

drug testing procedure." (Mem. in Opp'n at 5.) BNSF raises numerous independent arguments in support of its Motion: (1) an employer is not vicariously liable for the negligence of independent contractors it hires to carry out drug testing pursuant to federal regulations under Carroll v. Federal Express Corp., 113 F.3d 163, 165-66 (9th Cir. 1997) (BNSF Mem. in Supp. at 8-10); (2) Plaintiffs' claims are preempted by the Railway Labor Act (id. at 10-12); (3) Plaintiffs' negligence claims fail on their merits for lack of evidence (id. at 13-18); and (4) the FOTETA, FRSA, and FRA regulations preempt Plaintiffs' claims (id. at 18-21).

The Court has determined, pursuant to the above analysis, that BNSF's third argument is the one that will prevail.[11] Accordingly, because the underlying negligence claims against Medtox fail for lack of evidence of causation, BNSF's Motion for Summary Judgment will be granted.

**Conclusion**

---

[11]The Court notes, however, that it has serious doubts as to whether the claims against BNSF would survive summary judgment even if Plaintiffs' claims did not fail for lack of evidence of causation. For instance, Plaintiffs' only argument in response to BNSF's contention that their claims are preempted under the FOTETA and the FRSA is that "BNSF concedes that the rulings of Chapman regarding FRSA and FOTETA preemption are binding on this Court." (Mem. in Opp'n at 6.) However, in Chapman, the Eighth Circuit explicitly excepted from its consideration whether "an employer is vicariously liable for a laboratory's improper testing of urine samples." 390 F.3d at 622 n.1. In fact, the court distinguished cases against employers as different from those against the testing laboratory, and it noted that the relevant provision of the FOTETA, "is directed to negligence on the part of others involved in the collection, handling, and analysis of specimens." Id. at 628.

17

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS**

**ORDERED** that the Motions for Summary Judgment by Medtox (Doc. No. 38) and BNSF

(Doc. No. 42) are **GRANTED**;  Plaintiffs' Complaint (Doc. No. 1) is **DISMISSED WITH**

**PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 27, 2006

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

18